**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

WAYNE MURRAY MIKEAL,

    Plaintiff,

vs.                Case No. 6:18-cv-294-Orl-JRK

NANCY A. BERRYHILL,
Deputy Commissioner for Operations
of the Social Security Administration,
performing the duties and functions not
reserved to the Commissioner of
Social Security,
    Defendant.
_____/

## **OPINION AND ORDER**[1]

### **I. Status**

Wayne Murray Mikeal ("Plaintiff") is appealing the Commissioner of the Social Security Administration's final decision denying his claim for disability insurance benefits ("DIB"). Plaintiff's alleged inability to work is a result of "Seizures," "Delay Thought Process," and "Balance Issues." Transcript of Administrative Proceedings (Doc. No. 14; "Tr." or "administrative transcript"), filed April 30, 2018, at 76, 84, 199. On October 15, 2014, Plaintiff filed an application for DIB, alleging an onset disability date of October 1, 2012.[2]

---

[1]   The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. See Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 13), filed April 30, 2018; Reference Order (Doc. No. 15), entered May 1, 2018.

[2]   Although actually completed on October 15, 2014, the protective filing date of Plaintiff's application is listed elsewhere in the administrative transcript as October 3, 2014. See, e.g., Tr. at 76, 84. Additionally, it is noted that Plaintiff filed an application for supplemental security income ("SSI") at some point in the adminstrative proceedings. See Tr. at 93. That application was denied because Plaintiff's financial resources exceeded the limit for SSI. Tr. at 93-102. The denial of the SSI application is not at issue in this appeal. See Plaintiff's Brief (Doc. No. 18; "Pl.'s Br."), filed July 2, 2018, at 2 n.1.

Tr. at 180-81. Plaintiff's application was denied initially, see Tr. at 76-82, 83, 103, 104-09, and was denied upon reconsideration, see Tr. at 84-91, 92, 112, 113-17.

On November 29, 2016, an Administrative Law Judge ("ALJ") held a hearing, during which the ALJ heard testimony from Plaintiff, who appeared with a non-attorney representative[3]; from Teresa Mikeal, Plaintiff's sister-in-law; and from a vocational expert ("VE"). Tr. at 30-75. At the time of the hearing, Plaintiff was sixty-one (61) years old. Tr. at 36. The ALJ issued a Decision on February 27, 2017, finding Plaintiff not disabled through the date he was last insured for DIB. Tr. at 16-25. Plaintiff sought review of the ALJ's Decision by the Appeals Council. Tr. at 4-5, 177-79. On December 26, 2017, the Appeals Council denied Plaintiff's request for review, Tr. at 1-3, thereby making the ALJ's Decision the final decision of the Commissioner. On February 28, 2018, Plaintiff commenced this action under 42 U.S.C. § 405(g) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

Plaintiff advances three arguments on appeal: 1) the ALJ failed to apply correct legal standards and made findings not supported by substantial evidence regarding the testimony of Plaintiff's sister-in-law; 2) the ALJ failed to apply the correct legal standards to the opinion of Kristin Mickel, Psy.D., an examining psychologist; and 3) the ALJ failed to apply the correct legal standards regarding Plaintiff's musculoskeletal impairments and limitations, particularly those affecting his right ankle. Pl.'s Br. at 1-2, 11-14, 14-18, 18-21. On August 28, 2018, Defendant filed a Memorandum in Support of the Commissioner's Decision (Doc.

---

[3] Although the transcript of the hearing indicates that the representative is an "[a]ttorney," Tr. at 30, the appointment paperwork that was submitted by the representative indicates she is not an attorney, Tr. at 140.

No. 19; "Def.'s Mem.") responding to Plaintiff's arguments. Having thoroughly reviewed the parties' respective memoranda and the administrative transcript, the undersigned finds that reversal and remand for further proceedings is required.

## II. The ALJ's Decision

When determining whether an individual is disabled,[4] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

Here, the ALJ followed the five-step sequential inquiry. See Tr. at 18-25. At step one, the ALJ determined that Plaintiff "did not engage in substantial gainful activity during the period from his alleged onset date of October 1, 2012 through his date last insured of December 31, 2013." Tr. at 18 (emphasis and citation omitted). At step two, the ALJ found that "[t]hrough the date last insured, [Plaintiff] had the following severe impairments: cerebral palsy, intellectual disorder and seizure disorder." Tr. at 18 (emphasis and citation omitted).

---

[4] "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

At step three, the ALJ ascertained that "[t]hrough the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." Tr. at 18 (emphasis and citation omitted).

The ALJ determined that Plaintiff had the following residual functional capacity ("RFC") through the date last insured:

> [Plaintiff could] perform medium work as defined in 20 CFR [§] 404.1567(c) with ability to lift and carry 50 pounds occasionally and 25 pounds frequently; could stand and/or walk for 6 hours during an 8-hour workday; could sit for 6 hours during an[] 8-hour workday; could do occasional climbing of ramps/stairs, but no climbing of ladders/ropes/scaffolds; should avoid exposure to pulmonary irritants like fumes/odors/dust/gases/etc., proximity to moving mechanical parts; and should not operate a motor vehicle. Mentally [Plaintiff] is able to perform[] simple, routine, repetitive tasks that could be learned in 30 days or less, and is able to understand, remember and carry out simple instructions; [Plaintiff] is also limited to work that requires occasional interaction with co-workers, crowds and [the] public; [Plaintiff] is unable to meet fast paced, high production demands, no working in a conveyer belt, or production line or factory setting.

Tr. at 19-20 (emphasis omitted). At step four, the ALJ found that "[t]hrough the date last insured, [Plaintiff] was unable to perform any past relevant work" as a "construction worker" and "parking lot attendant." Tr. at 23 (some capitalization, emphasis and citation omitted). At step five, the ALJ considered Plaintiff's age ("58 years old . . . on the date last insured"), education ("a least a high school education and is able to communicate in English"), work experience, and RFC, and relied on the testimony of the VE to find that through the date last insured, "there were jobs that existed in significant numbers in the national economy that [Plaintiff] could have performed." Tr. at 24 (emphasis and citations omitted). Namely, the ALJ identified representative jobs of "Laundry labor" and "Packager agricultural produce." Tr. at 24 (some capitalization omitted). The ALJ concluded that Plaintiff "was not under a

disability . . . at any time from October 1, 2012, the alleged onset date, through December 31, 2013, the date last insured." Tr. at 25 (emphasis and citation omitted).

### III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Falge, 150 F.3d at 1322 (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence–even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## IV. Discussion

The arguments Plaintiff advances regarding the testimony of his sister-in-law and with Dr. Mickel's opinion (arguments one and two) are related and are addressed together. Then, Plaintiff's argument regarding his musculoskeletal impairments and limitations (argument three) is addressed.

### A. Dr. Mickel's Opinion and Plaintiff's Sister-In-Law's Testimony

Plaintiff contends the ALJ erred in addressing Dr. Mickel's opinion and his sister-in-law's testimony. Pl.'s Br. at 1, 11-14, 14-18. According to Plaintiff, the reasons the ALJ gave for assigning little weight to Dr. Mickel's opinion are conclusory and are not supported by substantial evidence. Id. at 16-18. Responding, Defendant argues that the ALJ properly gave the opinion "little weight because it was inconsistent with Plaintiff's medical and activity evidence from prior to his [date last insured.]" Def.'s Mem. at 13. With respect to Plaintiff's sister-in-law's testimony, Plaintiff argues that despite purportedly accepting the testimony, the ALJ "mischaracterized it to support the ability to perform simple tasks with some accommodations." Pl.'s Br. at 12-14. "In reality," argues Plaintiff, the testimony "supported more severe limitations in simple activities . . . ." Id. at 14. Responding, Defendant argues that "Plaintiff does not point to any clear inconsistency between [his sister-in-law's] statements and the ALJ's RFC finding." Def.'s Mem. at 11 (citation omitted). Defendant also contends the sister-in-law's testimony "was merely cumulative of Plaintiff's own testimony, which the ALJ found not entirely reliable." Id. (citations omitted).

**1. Evidence**

Dr. Mickel performed a neuropsychological assessment on January 21, 2015, January 26, 2015, and February 2, 2015 and authored a comprehensive report on February 17, 2015. Tr. at 312-23. The purpose of the assessment was "to determine [Plaintiff's] current level of cognitive, psychological, and adaptive functioning." Tr. at 312. Prior to assessing Plaintiff, Dr. Mickel reviewed available records, including various school records from Plaintiff's childhood and medical records. Tr. at 312-13. She also interviewed Plaintiff and his sister-in-law. Tr. at 312. She noted that the intake questionnaire was completed by Plaintiff with assistance from his brother and sister-in-law. Tr. at 312.

In terms of Plaintiff's history, Dr. Mickel noted that Plaintiff had been "diagnosed with cerebral palsy as a child." Tr. at 315; see Tr. at 316. Plaintiff also experienced seizures as a child, for which he now takes medication, but it was unclear whether he still suffered seizures because "he spends the majority of his time by himself." Tr. at 316. When talking about a stressful topic, Plaintiff has noticeable "tremors in his face, neck, and hands." Tr. at 316.

As a child, Plaintiff underwent extensive speech and physical therapy, and he attended The Gateway School for Exceptional Education to further those efforts. Tr. at 315. Plaintiff "had problems learning and paying attention in school," requiring repeating the first and second grades. Tr. at 316. For grades one through six, he attended "a special needs school," and for grades seven through nine, he attended public high school. Tr. at 316. For grades ten through twelve, he attended "two different tech schools." Tr. at 316. Plaintiff "received special education services throughout his academic career." Tr. at 316.

Dr. Mickel administered eleven psychological tests, including at least one designed to detect malingering. Tr. at 312. The results of the tests show generally average to low-average intellectual and executive functioning, low average auditory memory, and average to superior reasoning abilities. Tr. at 319-20. "Areas of cognitive weakness include[] processing speed, mental math, auditory memory for narrative information, motor speed, grip strength, and fine motor skills." Tr. at 321. Plaintiff's motor strength is borderline-impaired for his dominant hand, and low average for his non-dominant hand. Tr. at 320. Plaintiff's fine motor speed is in "the extremely low range for both hands." Tr. at 320. "The fine motor speed, coordination, and dexterity for both of his hands also [fall] within the extremely low range." Tr. at 320. Dr. Mickel's impression was "Other Specified Neurodevelopmental Disorder Due to Multiple Etiologies (Cerebral Palsy and Seizure Disorder by history). Tr. at 321.

According to Dr. Mickel regarding Plaintiff's then-current functioning:

[Plaintiff] requires assistance with managing his finances and doing household chores. His sister-in-law noted that he is able to perform a few basic chores, but he initially required a lot of repetition and practice to learn how to do them. She indicated that she often has to remind him to complete various household tasks. [Plaintiff] is not currently able to maintain steady employment or drive a motor vehicle. He noted that he voluntarily gave up his driver's license a few years ago after being involved in several minor motor vehicle accidents.

Tr. at 314. In addition, regarding Plaintiff's living situation, Dr. Mickel noted that Plaintiff lived with his mother until she passed away in 2005, and then Plaintiff tried living with a couple of different roommates but those situations did not work out. Tr. at 315. Plaintiff finally moved "into a house on his brother's property in 2008." Tr. at 315.

Dr. Mickel opined Plaintiff's "domestic skills reflect[] a low adaptive level with an age equivalent of eleven years nine months." Tr. at 320. According to Dr. Mickel, although Plaintiff is able to perform "basic household chores" and "is able to cook simple meals," Plaintiff "requires a lot of repetition in order to learn how to perform basic tasks." Tr. at 320. Plaintiff also "often needs prompting and/or assistance to complete these tasks." Tr. at 320. Dr. Mickel concluded that Plaintiff "does not appear to have the necessary cognitive or functional capabilities to perform his personal and instrumental activities of daily living independently." Tr. at 321. According to Dr. Mickel, "[b]ased on [Plaintiff's] reported work history and the developmentally-based, permanent nature of his deficits, it is unlikely that he will be able to maintain steady employment at this time or in the future." Tr. at 321.

Dr. Mickel then authored an addendum to the opinion on February 20, 2015, in which she gave the following clarification:

> The results of this evaluation indicate that [Plaintiff's] cognitive, adaptive, and motoric issues are developmentally-based and chronic in nature. Therefore, within a reasonable degree of psychological probability, it is likely that these issues existed at the same level of severity prior to December 31, 2013.

Tr. at 339.

At Plaintiff's hearing before the ALJ, Plaintiff's sister-in-law testified. Tr. at 51-66. Among other things, she testified that Plaintiff has never found a job on his own. Tr. at 52. According to her, at a job Plaintiff had working at a warehouse, he was let go because he "got angry and pulled out a knife or a box blade" after "being harassed and bullied" by people with whom he worked. Tr. at 52. Plaintiff's sister-in-law has tried to help him get a job "[f]or months and months," even to include her sitting in on interviews with Plaintiff, but no one has called them back. Tr. at 54. She cited one example of Plaintiff applying for a

job at Publix on a computer in the store, where she stood and watched Plaintiff on the computer, and "he really didn't get that." Tr. at 54.

According to Plaintiff's sister-in-law, she lives "a short distance" from Plaintiff's trailer, in close enough proximity that she can "hear him loudly speak to himself and the TV and other things that were around," although Plaintiff's tendency to loudly speak to himself does not happen as often as it once did. Tr. at 53. When asked if Plaintiff makes good decisions, his sister-in-law testified, "No, ma'am. Oh, my gosh, no. And that's why he can't live alone. He cannot live alone." Tr. at 53. She repeated several times throughout the hearing that Plaintiff is incapable of living alone. Tr. at 53, 54, 63. As an example, she cited a time when she "caught him hunched over in 95 degrees in his apartment . . . near death." Tr. at 63. She "constantly ask[s]" whether Plaintiff is taking his medications. Tr. at 63. She "[q]uite often" has to remind Plaintiff to take care of his personal needs. Tr. at 54.

According to Plaintiff's sister-in-law, Plaintiff does help out around the property by pulling weeds, painting, and throwing hay to the horses and, on occasion, helping with the manures. Tr. at 60. But, even with these "menial jobs," Plaintiff "forgets a lot." Tr. at 60. He is not reliable. Tr. at 60. Plaintiff "leaves rakes out" and "forgets to close gates." Tr. at 60. When Plaintiff's sister-in-law "go[es] away," she hires an animal sitter rather than relying on Plaintiff. Tr. at 60.

When asked by the ALJ whether in 2013, the date last insured, Plaintiff had the same limitations to which she testified, Plaintiff's sister-in-law responded, "Oh, yeah. Oh, Judge, he's been - - he's been ill for, like I said, all his life. He's had CP all his life." Tr. at 57. She testified that the cerebral palsy affects Plaintiff's motor functions in such a way that "when

he moved to [their] property, [she] begged his brother not to let him drive" because of the multiple accidents he had had. Tr. at 57-58. She believes that at least one of the accidents occurred because of a seizure, but she could not say for sure. Tr. at 58-59.

### 2. Legal Framework

The Regulations[5] establish a "hierarchy" among medical opinions[6] that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); see also 20 C.F.R. §§ 404.1527(e), 416.927(f).

---

[5] On January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence and symptoms for claims filed on or after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844 (January 18, 2017). Because Plaintiff filed his claim before that date, the undersigned cites the rules and Regulations that were in effect on the date the claim was filed, unless otherwise noted.

[6] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1513(a) (defining "[a]cceptable medical sources").

With regard to a treating physician or psychiatrist,[7] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's or psychiatrist's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's or psychiatrist's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician or psychiatrist should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Hargress v. Soc. Sec. Admin., Comm'r, 883 F.3d 1302, 1305 (11th Cir. 2018) (citation omitted); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's or psychiatrist's own medical records. Hargress, 883 F.3d at 1305 (citation omitted); Phillips, 357 F.3d at 1240-41; see also Edwards v.

---

[7] A treating physician or psychiatrist is a physician or psychiatrist who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An examining physician's opinion, on the other hand, is not entitled to deference. See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)); see also Crawford, 363 F.3d at 1160 (citation omitted). Moreover, the opinions of non-examining physicians, taken alone, do not constitute substantial evidence. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (citing Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)). However, an ALJ may rely on a non-examining physician's opinion that is consistent with the evidence, while at the same time rejecting the opinion of "any physician" whose opinion is inconsistent with the evidence. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B. 1981) (citation omitted).

An ALJ is required to consider every medical opinion. See 20 C.F.R. §§ 404.1527(d), 416.927(d) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham, 660 F.2d at 1084 (citation omitted); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279 (11th Cir.1987)); Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440.

Regarding the testimony or reports of third-parties, the Regulations in effect at the time the claim at issue here was filed provided that the Administration would take into

account evidence from family members, relatives, and caregivers in determining "the severity of [a claimant's] impairments and how it affects [the claimant's] ability to work." 20 C.F.R. §§ 404.1513(d)(4), 416.929(c)(3); see also Social Security Ruling ("SSR") 06-03p, 2006 WL 2329939, at *6; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990) (finding the failure of an ALJ to address such statements in the decision is reversible error); but see, e.g., De Olazabal v. Soc. Sec. Admin., Comm'r, 579 F. App'x 827, 832 (11th Cir. 2014) (if the statements are merely "cumulative of the other evidence in the record," failure to address them may not constitute reversible error). "'[T]he adjudicator generally should explain the weight given to opinions from these 'other sources' or otherwise ensure that the discussion of the evidence in the . . . decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.'" De Olazabal, 579 F. App'x at 832 (quoting SSR 06-03p[8]).

A claimant's daily activities can and should be considered by an ALJ in determining the extent to which the symptoms of a claimant's impairments affect his or her ability to perform job-related functions. See Davis v. Astrue, 287 F. App'x 748, 760 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)). But, an ALJ is not permitted to cite various daily activities as evidence to support a conclusion while ignoring others. See Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986); see also Lewis v. Callahan, 125 F.3d 1436, 1441 (11th Cir. 1997) (stating, "[W]e [do not] believe that participation in everyday activities of short duration, such as housework or fishing, disqualifies a claimant from disability"). In this regard, a reviewing court must "not consider only those parts of the record that support [an ALJ's] findings, but rather must view the entire record and take

---

[8] Although social security rulings are not binding on courts, they are accorded deference. See De Olazabal, 579 F. App'x at 832 (citing Fair v. Shalala, 37 F.3d 1466, 1468-69 (11th Cir. 1994)).

-14-

account of evidence in the record which detracts from the evidence relied on by the [ALJ]." Id. (quotation and citations omitted) (holding the appeals council erred in finding that the plaintiff's "daily activities and her ability to care for her personal needs have not been significantly affected" because it "ignored other evidence that her daily activities have been significantly affected").

### 3. ALJ's Decision

Regarding Dr. Mickel's opinion and Plaintiff's sister-in-law's testimony, the ALJ made various findings that directly implicate Plaintiff's daily activities. Specifically, the ALJ found as follows regarding Dr. Mickel's opinion:

> "[L]ittle weight [is given] to [Dr. Mickel's] opinion because it is inconsistent with [Plaintiff's] wide range of daily activities and is not supported by objective findings during the period at issue. In addition, protections afforded in the current [RFC] assessment would insulate limitations from the multiple etiologies identified in the [Dr. Mickel's] report.

Tr. at 22 (emphasis added). Regarding the testimony of Plaintiff's sister-in-law, the ALJ found:

> [She] testified [Plaintiff] would need accommodations to sustain any work activity. She also testified that [Plaintiff] was fired from jobs, could not manage his finances and would need reminders to complete tasks including self-care. According to the sister[-]in[-]law, [Plaintiff] gets mini seizures when under stress. The undersigned noted that these testimonials are somewhat consistent with the records, and they are not inconsistent with ability for simple tasks with some accommodations.

Tr. at 23.

In terms of summarizing Plaintiff's daily activities, the ALJ relied in large part on Plaintiff's testimony regarding them (despite the ALJ's finding that Plaintiff "exhibited some difficulty in understanding certain questions but he was able to answer them in a slow manner"). Tr. at 22. The ALJ stated that Plaintiff testified to "receiv[ing] some assistance

from family members," but that he also "weeds around the property and help[s] with animals." Tr. at 23.  The ALJ also noted Plaintiff's claim that "he is in the process of getting a job."  Tr. at 23.  Elsewhere in the Decision, the ALJ recognized Plaintiff "needed reminders [] for cleaning, shower, and changing cloth[e]s" and that he was fired from the warehouse job for "difficulty in getting along with others."  Tr. at 19 (citation omitted).  The ALJ also recognized a function report in which, according to the ALJ, Plaintiff "did not endorse any activities inconsistent with medium level exertion."  Tr. at 20.  Finally, in discussing the limited medical evidence from the relevant time period, the ALJ noted records indicating Plaintiff "enjoys dancing" and "has pets that include a cat."  Tr. at 21.

### 4. Analysis

The ALJ erred in addressing Dr. Mickel's opinion and Plaintiff's sister-in-law's testimony.  To start, the ALJ relied on an unspecified "wide range of daily activities" in discounting Dr. Mickel's opinion regarding Plaintiff's level of functioning.  Tr. at 22.  But, the ALJ's summaries of the daily activities in the Decision do not support the finding that they are of a "wide range," and worse, the summaries paint a brighter picture than the reality.  Compare Tr. at 23 (ALJ recognizing Plaintiff "receives some assistance from family members"), with Tr. at 53, 54, 63 (Plaintiff's sister-in-law testifying Plaintiff is incapable of living alone and her home is within hearing distance of his trailer on the same property; she "constantly ask[s]" whether he is taking medications; and she once "caught him hunched over in 95 degrees in his apartment . . . near death"); compare Tr. at 23 (ALJ recognizing Plaintiff "weeds around the property and help[s] with animals"), with Tr. at 60 (Plaintiff's sister-in-law testifying Plaintiff does help out around the property by pulling weeds, painting, feeding horses, and on occasion helping with manures, but he "forgets a lot" and is not

reliable; Plaintiff "leaves rakes out" and "forgets to close gates" and he is not trusted to animal sit when she is not around); compare Tr. at 23 (ALJ recognizing Plaintiff's claim that he is in the process of getting a job), with Tr. at 52-53 (Plaintiff's sister-in-law testifying that Plaintiff has never found a job on his own and she has tried to help him find one for months, to no avail). Then, the ALJ purportedly accepted Plaintiff's sister-in-law's testimony regarding his functioning, but again, the testimony showed greater limitations than the ALJ portrayed. In fact, Plaintiff's sister-in-law's testimony, particularly about Plaintiff's daily activities, was consistent with the observations and findings of Dr. Mickel. Compare Tr. at 51-66, with Tr. at 312-23. Accordingly, the ALJ's findings in assessing Dr. Mickel's opinion and Plaintiff's sister-in-law's testimony regarding Plaintiff's daily functioning are not supported by substantial evidence.

The ALJ's other reason for discounting Dr. Mickel's opinion was that it "is not supported by objective findings during the period at issue." Tr. at 22. Dr. Mickel, however, made a litany of objective findings in her comprehensive report, see Tr. at 312-23, and she opined that the findings applied as of the date last insured of December 31, 2013, Tr. at 339. The ALJ's reason that "objective findings" from "the period at issue" do not support the opinion is not supported by substantial evidence.[9]

In light of the foregoing, reversal and remand is required for the ALJ to reconsider Dr. Mickel's opinion and Plaintiff's sister-in-law's testimony, as well as Plaintiff's activities of daily living.

---

[9] To the extent that the ALJ was attempting to refer to the limited medical evidence in the file from the relevant period (rather than the purported lack of "objective findings during the period at issue"), this is all the more reason to carefully assess Dr. Mickel's opinion, which includes numerous objective findings.

**B. Musculoskeletal Impairments and Limitations**

Plaintiff argues the ALJ erred in assessing evidence related to his musculoskeletal impairments and limitations, particularly those involving his right ankle. Pl.'s Br. at 1-2, 19-21. According to Plaintiff, despite evidence showing permanent impairments impacting "the ability of the foot and ankle to function," the ALJ improperly found in the RFC that Plaintiff is capable of various activities including standing and walking six hours and climbing multiple hours. Id. at 20. Responding, Defendant contends Plaintiff did not raise any physical impairments (to include the ankle issues) as a basis for his alleged disability, and in any event, the ALJ properly considered evidence relating to Plaintiff's physical impairments. Def.'s Mem. at 16-19.

While Plaintiff did not specifically cite an ankle impairment as the basis for his alleged disability, he did cite "Balance Issues." Tr. at 76, 84, 199. And, the ALJ considered and discussed medical evidence relating to Plaintiff's ankle problems. See Tr. at 21. The undersigned notes that in addition to the evidence discussed by the ALJ on the issue, both Dr. Mickel and Plaintiff's sister-in-law provided insight into Plaintiff's ankle impairment. See Tr. at 316 (Dr. Mickel stating Plaintiff "stated that his right ankle was severely injured, and that significant surgical intervention was required to save his foot," and Plaintiff "continues to experience pain in his ankle, and he has increased difficulties with balance and mobility due to the injury"); Tr. at 59 (Plaintiff's sister-in-law testifying about the "ankle accident" that occurred after Plaintiff drove his car underneath a semi-truck). Given that the matter is due to be remanded for further consideration of Dr. Mickel's opinion and Plaintiff's sister-in-law's

testimony, the ALJ on remand shall also reconsider the extent to which Plaintiff's ankle impairment affects his ability to perform work-related functions.

## V. Conclusion

After due consideration, it is

**ORDERED**:

1. The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g), **REVERSING** the Commissioner's final decision and **REMANDING** this matter with the following instructions:

    (A) Reconsider the opinion of Dr. Mickel and the testimony of Plaintiff's sister-in-law, as well as Plaintiff's activities of daily living;

    (B) Reconsider the extent to which Plaintiff's ankle impairment affects his ability to perform work-related functions; and

    (C) Take such other action as may be necessary to resolve this claim properly.

2. The Clerk is further directed to close the file.

3. In the event benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in Case No. 6:12-mc-124-Orl-22 (In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) and 1383(d)(2)).

**DONE AND ORDERED** at Jacksonville, Florida on March 26, 2019.

                                                      JAMES R. KLINDT
                                                      United States Magistrate Judge

kaw
Copies to:
Counsel of record